

Nick Mirr
Federal Defenders of Eastern Washington and Idaho
306 E. Chestnut Ave.
Yakima, Washington 98901
509.248.8920
Attorney for Benjamin D. Cliett

United States District Court
Eastern District of Washington
Honorable Mary K. Dimke

| United States, | No. 1:22-CR-2111-MKD |
|---|---|
| Plaintiff, | Motion to Dismiss Indictment |
| v. | July 24, 2023 – 9:00 a.m. |
| Benjamin D. Cliett, | Yakima—With Argument |
| Defendant. | |

Benjamin D. Cliett hereby moves this Court for an order dismissing the indictment and superseding indictment in this case. Specifically, under the framework laid out by the Supreme Court in *Bruen*, because Mr. Cliett's conduct is plainly covered by the text of the Second Amendment, it is presumptively protected. Under *Bruen*, the government must show that a challenged law comports with this Nation's history and traditions of firearm regulation—i.e., that this type of regulation was widespread and accepted at the Founding. Because the government cannot meet their burden, the Court should dismiss the indictment against Mr. Cliett.

## I.    Background

Mr. Cliett is charged with one count of possession of a firearm while subject to a domestic violence restraining order, in violation of 18 U.S.C. § 922(g)(8).[1] Section 922(g)(8) prohibits from possessing a firearm or ammunition anyone subject to a court order if the order:

> (A) was issued after a hearing of which such person received actual notice, and at which such person had an opportunity to participate;
>
> (B) restrains such person from harassing, stalking, or threatening an intimate partner of such person or child of such intimate partner or person, or engaging in other conduct that would place an intimate partner in reasonable fear of bodily injury to the partner or child; and
>
> (C)(i) includes a finding that such person represents a credible threat to the physical safety of such intimate partner or child; or

---

[1] ECF No. 1 (Indictment); ECF No. 36 (Superseding Indictment).

Motion to Dismiss
– 1 –

1
2
     (ii) by its terms explicitly prohibits the use, attempted use, or threatened use of physical force against such intimate partner or child that would reasonably be expected to cause bodily injury[.][2]

3
Here, Mr. Cliett does not dispute that he was subject to such an order. Rather, Mr.

4
Cliett contends that 18 U.S.C. § 922(g)(8) runs afoul of the protections afforded him by

5
the Second Amendment.

6
## II.  Argument

7
  The Supreme Court's recent decision in *New York State Rifle & Pistol Ass'n, Inc.*

8
*v. Bruen* radically altered the analysis for a Second Amendment challenge.[3] As the

9
Court noted in *Bruen*, in the aftermath of *Heller* and *McDonald*, the Circuit Courts

10
generally adopted a two-step framework to analyze the validity of a regulation that

11
burdened Second Amendment rights. However, the Supreme Court made clear *this*

12
*approach is wrong.* The Court soundly rejected the application of any "means end"

13
scrutiny and instead laid out the appropriate test—one that is grounded squarely in the

14
historical tradition of firearm regulation in this country. Because the government

15
cannot meet its burden to demonstrate a historical tradition of prohibiting persons

16
subject to domestic violence restraining orders from possessing firearms, § 922(g)(8) is

17
unconstitutional. Accordingly, the indictment must be dismissed.

18

19

---

[2] 18 U.S.C. § 922(g)(8).
[3] 142 S.Ct. 2111 (2022).

A.    **Applicable Law**

In *District of Columbia v. Heller*, the Supreme Court identified the scope of the Second Amendment.[4] There, the Court explained that the right to bear arms is an individual right that "belongs to all Americans."[5] It went on to clarify that the right existed outside of purely the militia context and instead that the Second Amendment "guarantee[s] the *individual* right to possess and carry weapons in case of confrontation."[6] In *McDonald v. City of Chicago*, the Supreme Court confirmed this individual right and noted that *Heller* made "clear that this right is 'deeply rooted in this Nation's history and tradition.'"[7] The Court went on to caution against treating the Second Amendment "as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees[.]"[8]

Nonetheless, in the aftermath of *Heller* and *McDonald*, circuit courts generally developed a two-step framework for analyzing Second Amendment challenges.[9] This included the Ninth Circuit, who employed a two-step test that asked "whether the challenged law burdens conduct protected by the Second Amendment."[10] If so, the

---

[4] 554 U.S. 570 (2008).

[5] *Id*. at 581.

[6] *Id*. at 592.

[7] *Id*. at 768 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)).

[8] 561 U.S. 742, 780 (2010).

[9] *Bruen*, 142 S.Ct. at 2126.

[10] *Mai v. U.S.*, 952 F.3d 1106, 1113 (9th Cir. 2020).

Motion to Dismiss

– 3 –

court would then "apply an appropriate level of scrutiny."[11] Generally, intermediate scrutiny would be applied and strict scrutiny was reserved for "laws that both implicate a core Second Amendment right and place a substantial burden on that right."[12]

In *Bruen*, however, the Supreme Court made clear this two-step inquiry was improper. "Despite the popularity of this two-step approach, it is one step too many."[13] The Court explicitly declined to adopt the two-part test utilized by circuit courts and held instead:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."[14]

In *Bruen*, the Supreme Court noted that their rationale in *Heller* had been misinterpreted by the circuit courts. It clarified that *Heller* did not use means-end tests to determine the scope of the Second Amendment or the constitutionality of a

---

[11] *Id.*

[12] *Id.* at 1115.

[13] *Bruen*, 142 S.Ct. at 2127.

[14] *Id.* at 2126.

1  regulation.[15] Instead, "*Heller* relied on text and history."[16] With this in mind, the

2  Court then outlined the true analysis they developed in *Heller* and applied it.[17]

3      That standard directs courts to begin by asking whether "the Second

4  Amendment's plain text covers an individual's conduct."[18] If it does, then "the

5  Constitution presumptively protects that conduct."[19] In *Bruen*, this was an easy

6  analysis. The Court "ha[d] little difficulty concluding" that the Second Amendment

7  protected the petitioner's right to carry handguns in public.[20] The Court made clear

8  that the Second Amendment drew no distinction between the home and public, and for

9  that reason, had no difficulty finding the challenged law infringed the right to bear arms

10  in public.[21]

11      With this in mind, the Court turned next to what the Government must do to

12  rebut the now established presumption of unconstitutionality. The Court noted "the

13  government may not simply posit that [a] regulation promotes an important

14  interest."[22] Instead, the government must show the regulation is "consistent with this

15

16

---

17  [15] *Id.* at 2128-29.

   [16] *Id.* at 2129.

   [17] *Id.* at 2131.

18  [18] *Id.* at 2126.

   [19] *Id.*

   [20] *Id.* at 2134.

19  [21] *Id.* at 2135.

   [22] *Id.* at 2126.

Nation's historical tradition of firearm regulation."[23] If it cannot do so, the statute must be found unconstitutional.

The Supreme Court identified two distinct inquiries that may be conducted into historical tradition. Which of the two is used depends on the regulation challenged. The first situation arises "when a challenged regulation addresses a general societal problem that has persisted since the 18th century."[24] The Court noted that this "inquiry will be fairly straightforward" and that "the lack of a *distinctly similar* historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment."[25]

The Court also identified, however, some cases may require a "more nuanced" analysis.[26] When the societal problem involves "unprecedented societal concerns or dramatic technological changes" that were distinct from "those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868," analogical reasoning may be used.[27] There the government may attempt to rebut the presumption of unconstitutionality by identifying "relevantly similar" historical regulations.[28]

---

[23] *Id.*

[24] *Id.* at 2131.

[25] *Id.*

[26] *Id.*

[27] *Id.* at 2132 ("When confronting such present-day firearm regulations, this historical inquiry that the courts must conduct will often involve reasoning by analogy.").

[28] *Id.*

In conducting the historical analysis, the Court provided careful guidance. "[W]hen it comes to interpreting the Constitution, not all history is created equal."[29] Specifically, the scope of a constitutional right is based on how the right would have been understood when it was adopted.[30] For that reason, a relevant "historical tradition" for purposes of a federal gun regulation is one that existed in 1791, when the Second Amendment was ratified.[31] Although courts may look at firearm regulations before or after the Founding, this should be done with care. "Historical evidence that long predates" 1791 (adopting of the Second Amendment) or 1868 (the adopting of the Fourteenth Amendment) "may not illuminate the scope of the right if linguistic or legal conventions changed in the intervening years."[32] Courts should not "rely on an ancient practice that had become obsolete in England at the time of the adoption of the Constitution and never was acted upon or accepted in the colonies."[33]

The Court also cautioned against relying heavily on postenactment history and giving "it more weight than it can rightly bear."[34] Evidence "of how the Second Amendment was interpreted from immediately after its ratification through the end of

---

[29] *Id.* at 2136.
[30] *Id.*
[31] *Id.*
[32] *Id.*
[33] *Id.* (cleaned up).
[34] *Id.*

1   the 19th century represent[s] a critical tool of constitutional interpretation."[35] But the

2   more removed from 1791, the less probative historical evidence becomes.[36] Mid-to late

3   19th-century evidence provides only limited insight into the analysis.[37] Courts should

4   therefore credit such history to the extent it provides "confirmation" of prior practice

5   with which it is consistent, but should otherwise afford it little weight.[38] After all,

6   "post-ratification adoption or acceptance of laws that are *inconsistent* with the original

7   meaning of the constitutional text obviously cannot overcome or alter that text."[39] The

8   Court went so far as to refuse to "address any of the 20th-century historical evidence"

9   cited by New York in *Bruen* because "it does not provide insight into meaning of the

10   Second Amendment when it contradicts earlier evidence."[40]

11       Finally, the Supreme Court was adamant that "the burden falls on [the

12   government] to show that [a given statute] is consistent with this Nation's historical

13   tradition of firearm regulation."[41] The deciding court is "not obliged to sift the

14

---

15   [35] *Id.* (cleaned up).

16   [36] *Id.* at 2137 ("As we recognized in *Heller* itself, because post-Civil War discussions of the
     right to keep and bear arms 'took place 75 years after the ratification of the Second
17   Amendment, they do not provide as much insight into its original meaning as earlier
     sources.'" (*Heller*, 554 U.S. at 614)).

     [37] *Id*
18   [38] *Id.*

19   [39] *Id.* (quoting *Heller*, 670 F.3d at 1274, n. 6 (Kavanaugh, J., dissenting)) (emphasis in
     original).
     [40] *Id.* at 2154 n. 28.
     [41] *Id.* at 2135

1  historical materials for evidence to sustain [the government's] statute. That is [the

2  government's] burden."[42]

3      Distilling the test outlined in *Bruen*, the analysis is as follows:

4      First, the court must determine whether the "plain text" of the Second

5  Amendment covers the alleged conduct.[43] If so, the conduct is presumptively

6  protected. The government, then, bears the burden to rebut the presumption of

7  unconstitutionality.

8      Second, to rebut that presumption, the government must demonstrate the

9  challenged regulation is consistent with the nation's history and tradition of firearms

10 regulations. When the problem sought to be addressed by the regulation is one that has

11 persisted since the time of the Founders, the government must point to "distinctly

12 similar" regulations. They may *not* apply the more nuanced "analogical reasoning"

13 approach the Supreme Court reserved for modern problems not contemplated by the

14 Founders. It is distinctly the government's burden to affirmatively prove the

15 challenged regulation is part of our Nation's history and traditions.

16 B.    **Applying *Bruen* and its progeny to Mr. Cliett's case, the government is unable to meet their burden.**

17     Mr. Cliett is alleged to have possessed firearms inside of his home. Because he is

18 part of "the people" protected by the Second Amendment and his conduct is covered

19

---

[42] *Id*. at 2150.
[43] *Id*. at 2126.

by the "plain text" of the amendment, it is presumptively protected. Here, the government must rebut the presumption of unconstitutionality. Because domestic violence is a problem which undeniably existed at the time of the Founding, the more restrictive "distinctly similar" analysis applies. The government may not rely on analogical reasoning to support § 922(g)(8). That said, under either the more exacting "distinctly similar" or the more permissive "relevantly similar" standard, the government cannot meet their burden. Accordingly, the indictment must be dismissed.

> **1.    Mr. Cliett's conduct is protected by the "plain text" of the Second Amendment because he is among "the people" whose possession of firearms is secured.**

The first step in a Second Amendment challenge is to determine whether "the Second Amendment's plain text covers an individual's conduct."[44] This is an exceptionally straightforward process here. Mr. Cliett is alleged to have possessed firearms inside of his home. The Second Amendment explicitly protects "the right of the people to keep and bear Arms."[45] As the Supreme Court recognized in *Heller* and confirmed in *McDonald*, self-defense, and indeed self-defense in the home, are at the core of the protections granted by the Second Amendment.[46] Accordingly, the alleged possession here clearly falls within the scope of protected conduct.

---

[44] *Bruen*, 142 S.Ct. at 2126.

[45] U.S. CONST. amend. II.

[46] *See McDonald*, 561 U.S. at 767-68 (citing *Heller*, 554 U.S. at 559,628-30). *See also United States v. Rahimi*, 61 F.4th 443, 454 (5th Cir. 2023) (striking down §922(g)(8) as unconstitutional and noting that "Rahimi's possession of a pistol and rifle easily falls

1      The government may argue that Mr. Cliett is not a part of "the people" because

2   he is not "law-abiding" or "responsible." This is incorrect. In *Heller*, the Supreme

3   Court used the phrase "law-abiding citizens" when describing the scope of the Second

4   Amendment.[47] These descriptors appeared again in *Bruen* where the Court noted that

5   "[i]t is undisputed that petitioners Koch and Nash—two ordinary, law-abiding, adult

6   citizens—are part of 'the people' whom the Second Amendment protects."[48] Even in

7   *Heller*, however, the Court clarified that throughout the Constitution, the term "the

8   people" "unambiguously refers to all members of the political community, not an

9   unspecified subset."[49] The Supreme Court noted, then, that "[w]e start therefore with

10  a strong presumption that the Second Amendment right is exercised individually and

11  belongs to all Americans."[50]

12     A recent decision by the Third Circuit, in which they struck down § 922(g)(1) as

13  applied, elucidates the problem with the argument that being "law-abiding" or

14  "responsible" is a necessary condition of being part of "the people." In *Range v. Att'y

15  Gen. U. S.*, the Third Circuit struck down § 922(g)(1) as it applied to Mr. Range.[51]

16

17  _____

within the purview of the Second Amendment.").

18  [47] 554 U.S. at 635 (noting that the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home.").

[48] *Bruen*, 142 S.Ct. at 2134.

19  [49] *Heller*, 554 U.S. at 580.

[50] *Id*. at 581.

[51] No. 21-2835, 2023 WL 3833404 (3d Cir. June 6, 2023).

Although Mr. Range had indeed been convicted of a felony offense, he "claim[ed] that he is one of 'the people' entitled to keep and bear arms."[52] The Third Circuit recognized that the "law-abiding" descriptor used in *Heller, McDonald*, and *Bruen* was only dicta, as the criminal history of the plaintiffs was not at issue.[53] Further, it recognized that should Mr. Range not be considered one of "the people" under the Second Amendment, it would require a variable definition of "the people" as it appears elsewhere in the Constitution because he clearly had not lost his right to peaceful assembly or to be free from unreasonable search and seizure.[54] Finally, the Third Circuit highlighted how unworkable a standard "law-abiding, responsible citizens" would create. It recognized that individuals who are convicted of petty misdemeanors were not intended to have their rights stripped and that the modifier "responsible" creates a "hopelessly vague" category.[55]

This Court should follow the Third Circuit's interpretation. The terms "law-abiding" and "responsible" do not define the limits of the Second Amendment. Better understood, the Supreme Court's usage of these terms appears to signify that these are sufficient, but not necessary, descriptors that render an individual part of "the people" protected by the Second Amendment. Even more importantly, Mr. Cliett has not been

---

[52] *Id*. at *3
[53] *Id*. at *4.
[54] *Id*.
[55] *Id*.

*convicted* of any crime that would call into question his right to keep and bear arms. Rather, the protective order was a civilly imposed instrument, implemented without a finding of guilt. Mr. Cliett is, therefore, clearly a part of "the people" and his possession of firearms is presumptively protected by the plain text of the Second Amendment.

**2.    The government cannot establish § 922(g)(8) is consistent with the United States' "historical tradition of firearm regulation."**

Because Mr. Cliett's alleged conduct here is covered by the plain text of the Second Amendment, the government must now establish that § 922(g)(8) is consistent with the national tradition of firearm regulation. They will be unable to do so because there is no "distinctly similar" regulation to point to.

**a.  Intimate-partner violence is not a new phenomenon**

After finding that an individual's conduct is covered by the plain text of the Second Amendment, the next step is to determine whether the problem sought to be addressed is "longstanding" or a new societal issue.[56] Here, the societal problem at

---

[56] *See Bruen*, 142 S.Ct. at 2131 (noting that "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a *distinctly similar* historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment.") (emphasis added); *see also id.* at 2132 (noting "[m]uch like we use history to determine which modern 'arms' are protected by the Second Amendment, so too does history guide our consideration of modern regulations that were unimaginable at the founding. When confronting such present-day firearm regulations, this historical inquiry that courts must conduct will often involve *reasoning by analogy*—a commonplace task for any lawyer or judge.") (emphasis added).

which § 922(g)(8) is directed—domestic violence—unquestionably existed at the time of the Founding.[57] Indeed, society in Puritan New England seemed to acknowledge that it was a social ill. There were laws aimed at preventing domestic abuse and "domestic violence offenders might be brought before a magistrate, bound over, and sentenced to a variety of punishments that often included public shaming."[58]

### b. Domestic violence restraining orders and § 922(g)(8) are recent developments and there are no "distinctly similar" historical counterparts.

Despite there being widespread knowledge, and apparently the condemnation, of domestic violence, defense counsel is unaware of any law specifically prohibiting domestic violence perpetrators from possessing a firearm that existed around 1791. As the Supreme Court noted, this is evidence suggesting "the challenged regulation is inconsistent with the Second Amendment."[59] Indeed, a review of the history surrounding 18 U.S.C. § 922(g)(8) and domestic violence restraining orders more generally highlights how modern these measures truly are.

Washington D.C. was the first jurisdiction to pass a law providing for domestic violence protective orders in 1970.[60] Pennsylvania followed suit in 1976 when it became

---

[57] *See, e.g.*, Carolyn B. Ramsey, *The Stereotyped Offender: Domestic Violence and the Failure of Intervention*, 120 PENN ST. L. REV. 337, 343-55 (2015) (discussing the problem of domestic violence beginning in Puritan New England).

[58] *Id.* at 346.

[59] *Bruen*, 142 S.Ct. at 2131.

[60] Melvin Huang, Note, *Keeping Stalkers at Bay in Texas*, 15 TEX. J. C.L. & C.R. 53, 68 (2009).

the first state to pass such a law.[61] The other states likewise passed similar laws and now "all jurisdictions in the United States provide civil protection orders for victims of intimate or family violence."[62] Section 922(g)(8) is an even more recent phenomenon. Not until 1993 was the bill behind § 922(g)(8) introduced and it wasn't signed into law until September of 1994.[63] "[T]here is simply no tradition—from 1791 or 1866—of prohibiting gun possession (or voting, jury service, or government service) for people convicted of misdemeanors or subject to civil protective orders."[64]

Although the Ninth Circuit has yet to consider the constitutionality of § 922(g)(8) post-*Bruen*, it did provide some relevant insight on its perspective of the issue in *United States v. Chovan*.[65] Mr. Chovan challenged 18 U.S.C. § 922(g)(9)— which bars domestic violence misdemeanants from possessing firearms—and argued that it was unconstitutional in light of *Heller* and *McDonald*.[66] Like § 922(g)(8), § 922(g)(9) did not become law until recently when it was finally approved and signed by

---

[61] *Id.*

[62] *Id.*

[63] Tom Lininger, *A Better Way to Disarm Batterers*, 54 Hastings L.J. 525, 538-544 (2003) (discussing the legislative history of 18 U.S.C. § 922(g)(8)).

[64] David B. Kopel & Joseph G.S. Greenlee, *The Federal Circuits' Second Amendment Doctrines*, 61 St. Louis. U. L.J. 193, 244 (2017) (providing an overview of the circuit court caselaw on the Second Amendment after reviewing every post-*Heller* circuit court opinion).

[65] 735 F.3d 1127 (9th Cir. 2013).

[66] *Id.* at 1133.

the President in 1996.[67] Although the Ninth Circuit ultimately upheld § 922(g)(9) under the now-defunct "means-end" analysis, its rationale is informative. The government argued that the statute was lawful because "it does not burden rights historically understood to be protected by the Second Amendment."[68] The court disagreed. It noted that "[t]he first federal firearm restrictions regarding violent offenders were not passed until 1938."[69] Moreover, "and more importantly, the government has not proved that *domestic violence misdemeanants* in particular have historically been restricted from bearing arms."[70] The Court went on to specify that these individuals had not been prohibited from possession of firearms until 1996.[71] In light of these facts, the Ninth Circuit held that "we are certainly not able to say that the Second Amendment, as historically understood, did not apply to persons convicted of domestic violence misdemeanors."[72]

Here, then, for much the same reasons as the Ninth Circuit highlighted in *Chovan*, there is no "distinctly similar" historical tradition in this Nation prohibiting

---

[67] Lininger, *supra* n. 62 at 551-58 (discussing the legislative history of § 922(g)(9)).

[68] *Chovan*, 735 F.3d at 1137.

[69] *Id.*

[70] *Id.* (emphasis in original).

[71] *Id.* (noting "domestic violence misdemeanants were not restricted from possessing firearms until 1996.").

[72] *Id.* (quoting *U.S. v. Chester*, 628 F.3d 673, 681-82 (4th Cir. 2010)).

persons subject to domestic violence protective orders from possession of firearms. As such, the government will be unable to meet its burden under *Bruen*.

### c. Even under the more permissive, "relevantly similar" framework, the government cannot meet its burden.[73]

As discussed above, the Supreme Court recognized in *Bruen* that when addressing modern problems, analogical reasoning may be applied to determine whether there were "relevantly similar" historical prohibitions on firearms possession.[74] Because domestic violence is not a modern problem, this standard should not apply. Even under this more flexible standard, however, the government cannot meet their burden.

In *United States v. Rahimi*, the Fifth Circuit struck down § 922(g)(8) because it violates the Second Amendment under the *Bruen* test.[75] *Rahimi* discussed at length, several possible "historical analogues" cited by the government in defense of § 922(g)(8). The Fifth Circuit concluded that each fell short of the mark.[76]

---

[73] Mr. Cliett maintains that the appropriate standard for § 922(g)(8) is the "distinctly similar" test. However, because he anticipates the government arguing that there are sufficient historical analogues to render § 922(g)(8) constitutional, he will address why they fall short under the later standard.

[74] *Bruen*, 142 S.Ct. at 2132.

[75] 61 F.4th 443, 461 (5th Cir. 2023).

[76] Mr. Cliett intends to save his full argument on this issue for his reply brief if the government in actuality attempts to rely on these types of statutes to support § 922(g)(8).

First, the government pointed to laws that disarmed "dangerous" people in both England and the United States.[77] Respectively, these laws granted the Crown the ability to seize arms from "dangerous" individuals or for colonial governments to disarm persons they deemed "dangerous" or who refused to swear oaths of allegiance.[78] The Fifth Circuit noted that these laws fail to serve as historical analogues for two reasons. First, they may have been aimed more at disarming individuals who were not part of "the people," rather than "curtailing violence or ensuring the security of the state."[79] Second, and more importantly, the purpose of those laws "was ostensibly the preservation of political and social order, not the protection of an identified person from the threat of 'domestic gun abuse.'"[80] Because of the distinctly different goals, the court found these laws did not serve as historical analogues.[81]

Second, the government suggested colonial laws that prohibited "going armed" were relevantly similar.[82] These laws all generally prohibited individuals from being "armed offensively" and, as the Fifth Circuit noted, "appear to have been aimed at curbing terroristic or riotous behavior" generally, rather than disarming specific

---

[77] *Rahimi*, 61 F. 4th at 456-57.

[78] *Id.*

[79] *Id.* at 457.

[80] *Id.*

[81] *Id.*

[82] Specifically, the government pointed to "four exemplars codified in the Massachusetts Bay Colony, the state of Virginia, and the colonies of New Hampshire and North Carolina." *Id.* at 457-58.

Motion to Dismiss
– 18 –

1    individuals.[83] Because of this different purpose, again, the court held these laws were

2    not a "viable historical analogue[] for § 922(g)(8)."[84] Indeed, "going armed" laws

3    seem to be much more closely linked to the prohibitions contained within 18 U.S.C. §

4    924(c)(1)(A), than § 922(g)(8) and do not provide meaningful support for its

5    constitutionality.

6         Third and finally, the government pointed to "surety" laws which could be used

7    to require an individual to forfeit possession of arms without being convicted of any

8    crime. Though the Fifth Circuit noted that these laws came closer to meeting the

9    required "relevantly similar" standard, there are sufficient bases to differentiate

10   between the two.[85] Although the surety statutes did serve to disarm individuals due to

11   an identified threat to a specific person and required only a civil proceeding where the

12   threat was found credible, the prohibition on possession was not absolute.[86]

13   "[H]istorical surety laws did not prohibit public carry, much less possession of

14   weapons, *so long as the offender posted surety*."[87] Because of the distinctly different

15   character of the deprivation, the Fifth Circuit held the surety laws were not sufficient

16   to support the constitutionality of § 922(g)(8).[88]

17

---

18   [83] *Id.* at 459.

     [84] *Id.*

     [85] *Id.* at 459-60.

19   [86] *Id.* at 460.

     [87] *Id.*

     [88] *Id. See also*, *Bruen*, 142 S.Ct. at 2148 (noting that the surety statutes did not provide

1   These statutes, then, were aimed at distinct problems from alleged domestic

2   violence perpetrators and their access to firearms. The problem of domestic violence

3   was certainly within the comprehension of the Founders, yet they failed to take any

4   steps to disarm those individuals accused of domestic violence. As the Fifth Circuit

5   noted in *Rahimi*, "[t]he question presented in this case is not whether prohibiting the

6   possession of firearms by someone subject to a domestic violence restraining order is a

7   laudable policy goal."[89] Instead, the question is whether it is part of this Nation's

8   history and traditions. Though the surety laws functioned in a similar manner, these

9   laws permitted an individual to post a surety and retake possession of their arms.

10  Section 922(g)(8) has no such mechanism and therefore works a much more significant

11  interference with the right to bear arms. This Court should hold that because there was

12  no distinctly similar historical regulation disarming individuals subject to domestic

13  violence restraining orders, the government is unable to meet its burden. Accordingly,

14  the indictment against Mr. Cliett must be dismissed.

15              **III.    Conclusion**

16  For the reasons stated above, § 922(g)(8) violates the Second Amendment and

17  the initial and superseding indictments against Mr. Cliett must be dismissed.

18

19  _____

historical support for New York's "special need" statute because, *inter alia*, they did not prohibit public carry so long as a surety was posted.").
[89] 61 F.4th at 448.

Dated: June 12, 2023.

Federal Defenders of Eastern Washington & Idaho
Attorneys for Benjamin D. Cliett

s/ Nick Mirr
Nick Mirr, AT0014467
Iowa State Bar Ass'n
306 E. Chestnut Ave.
Yakima, Washington 98901
t: (509) 248-8920
nick_mirr@fd.org

Service Certificate

I certify that on June 12, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System, which will notify Assistant United States Attorneys: Michael J.A. Ellis and Thomas J. Hanlon.

s/ Nick Mirr
Nick Mirr, AT0014467
Iowa State Bar Ass'n
306 E. Chestnut Ave.
Yakima, Washington 98901
t: (509) 248-8920
nick_mirr@fd.org